UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

TERESA SUZANNE WESCOTT,       )
                              )
            Plaintiff         )
                              )
       v.                     )   Case No. 4:08-cv-36
                              )
MICHAEL J. ASTRUE, COMMISSIONER )
OF SOCIAL SECURITY,           )
                              )
            Defendant         )

OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the plaintiff, Teresa S. Wescott, on May 22, 2008.  For
the reasons set forth below, the decision of the Commissioner is
**AFFIRMED.**

Background

The plaintiff, Teresa S. Wescott, applied for Disability
Insurance Benefits on August 24, 2005, alleging a disability
onset date of August 1, 1998. (Tr. 14)  Her claim initially was
denied on November 14, 2005, and again denied upon reconsidera-
tion on February 21, 2006.  (Tr. 41, 46)  Wescott requested a
hearing before an Administrative Law Judge ("ALJ") on April 25,
2006.  (Tr. 49)  A hearing before ALJ Blanca B. de la Torre was
held on April 16, 2007, at which Wescott, her husband Roger
Wescott, medical expert Charles Bonsett, M.D., and vocational
expert Ray O. Burger testified.  (Tr. 261-323)

On October 25, 2007, the ALJ issued her decision denying benefits. (Tr. 14-23) The ALJ found that Wescott was not under a disability within the meaning of the Social Security Act from August 1, 1998 through June 30, 2001. (Tr. 14) Following a denial of her request for review by the Appeals Council on May 12, 2008, Wescott filed a complaint in this court on May 22, 2008. (Tr. 4-7, DE 1)

Because of her husband's income, Wescott is ineligible for Supplemental Security Income ("SSI"), making the sole issue of this claim for Disability Insurance Benefits whether the claimant was disabled from August 1, 1998 to June 30, 2001, her date last insured ("DLI"). (Tr. 14) Therefore, regardless of the litany of illnesses and conditions that Wescott reported in her application, only evidence of those occurring between 1998 and 2001 are relevant.

Wescott was born on February 27, 1962, making her 47 years old at present. (Tr. 53) Wescott's medical problems arose sometime in 1994 when she was hit on the head by a falling rafter. (Tr. 63) Wescott suffered her first myoclonic seizure the next day, but she reported a full recovery from this incident. (Tr. 63) However, a car accident six months later restarted the myoclonic seizures. (Tr. 63) Wescott was seen by Curtis L. Gingrich, M.D. in January 1997 to follow up on her myoclonic seizure disorder, and he suggested that she see a different neurologist or visit the Mayo Clinic. (Tr. 113) Records from

follow-up visits and numerous phone call messages to Dr. Gingrich
reveal that Wescott arranged to be examined at the Mayo Clinic,
but that by the summer of 1997, she was released to do light duty
work and was weaned off her seizure medication.  (Tr. 114, 116)

In July 1997, Wescott requested a doctor's slip "saying she
can lift up to 25 lbs" for her "new employment."  (Tr. 115)  An
April 1, 1998 entry by Dr. Gingrich noted that Wescott stated
"that her symptoms have been under good control" with the medica-
tion pre- scribed and that the Mayo Clinic "agreed that [her
myoclonic seizure disorder] was probably not a true seizure but
more of an exaggerated anxiety response."  (Tr. 117)  Yet, an
April 3, 1998 entry indicated that Wescott called and complained
of "a lot of pain."  (Tr. 117)  Entries continued through October
1998. Entries dated July 14, 1999, August 9, 1999, and October 8,
1999, all contained a variety of complaints of dizziness, pain,
nausea, congestion, seizures, and shakiness, again, mainly
conveyed by phone.  (Tr. 118-122)  EEG diagnosis, EMG diagnosis,
ultrasound, and upper GI series conducted at this time were all
normal.  (Tr. 135-36)

Wescott has three chart entries in April 2000 presenting a
variety of complaints, but ending with a note that her MRI was
negative for both her brain and spine.  (Tr. 123, 133-34)  Al-
though there are two chart entries and one no-show entered in
2000, there was nothing notable included.  (Tr. 124)  The sole
document in this section of charts from 2001 described Wescott's
visit with Gregory G. Hill, M.D., when she complained of "a lump

3

on her chest" which "she would like this further evaluated."
(Tr. 126)  The diagnosis was "Blackhead."  (Tr. 126)

Wescott saw Albert C. Lee, M.D., a neurologist, four times
from August 1998 to October 1998.  (Tr. 141-149)  The notes from
her October 16, 1998 visit stated that Wescott had improved in
recent weeks, still had some "diffuse and not consistent" lower
back pain, but was "doing better."  (Tr. 141-42)

Wescott was evaluated at the Mayo Clinic on August 14, 1997,
where the final diagnoses was "Musculoskeletal neck and low back
pain" and "Stimulus or startle-induced nonepileptic, likely
stress related, myoclonus movement."  (Tr. 150-159)  A psychiat-
ric consult conducted at this time added as impressions: "Somato-
form disorder NOS vs. Anxiety disorder with hypochondriasis."[1]
(Tr. 171-72)

After Wescott applied for Disability Insurance Benefits in
2005, a DDS document titled Psychiatric Review Technique signed
and dated November 7, 2005, had two boxes checked under "Medical
Disposition(s)":  (7) Coexisting Nonmental Impairment(s) that
Requires Referral to Another Medical Specialty; and (8) Insuffi-
cient Evidence.  (Tr. 98)  These marked boxes on page one of the
document constituted the only retroactive assessment made by the
DDS physician completing the form.  (Tr. 98)

---

[1]A somatoform disorder is one characterized by symptoms suggesting a
physical disorder but for which there are no demonstrable organic findings or
known physiological mechanisms.  "NOS" generally refers to Not Otherwise
Specified when used in disease classifications.

Counsel for Wescott submitted to the ALJ a series of medical records "[r]egarding [Wescott's] worsening of medical condition." (Tr. 213) However, the records concerned Wescott's hospital admittance in August of 2007, long after the relevant time period. (Tr. 214-234) Additionally, counsel provided letters from K. Chandrasekhar, M.D., (Tr. 235-36) and an unnamed chiropractor from Goble Heal Chiropractic (Tr. 239) describing Wescott's symptoms in 2005. A letter dated April 4, 2005, from Mark Heal, D.C., of Goble Heal Chiropractic, explained that Wescott "presented to our office on June 29, 2000 with low back pain, neck pain, and seizures." (Tr. 204) The letter continued by finding that her seizures were related to her T2 motor unit and extolling Wescott's response to her adjustments. (Tr. 204)

At the hearing before ALJ de la Torre, Wescott testified about all of her past work history in the 15 years prior to her DLI. (Tr. 269-278) Wescott told of her rafter head injury and car accident and the resulting uncontrollable jerking. (Tr. 279) The ALJ carefully questioned Wescott about the doctors who treated her during the relevant time period between 1998 and 2001. (Tr. 279-284) Wescott corrected the ALJ in her description of her "seizures", stating that she never lost consciousness but just suffered from the jerking and shuddering of her extremities. (Tr. 284-85) Wescott talked about the doctors' visits during the relevant time period and beyond, though the ALJ concentrated on the period from 1998 to 2001. (Tr. 285-289) The ALJ asked questions about the pain at that time, her ability to

5

sit, stand, and lift, and Wescott had difficulty remembering specifics. (Tr. 290-293) Discussing her work history, Wescott recalled working at a book store part time at the time of her DLI. (Tr. 295)

Wescott's attorney questioned her, eliciting testimony about Wescott's physical difficulties while working at the Marsh grocery store which led to her lack of dependability and ultimately quitting her job there. (Tr. 297-300)

Wescott's husband of 26 years was questioned by her counsel, and he described the accident with the board or rafter falling on her head in 1994 and her reaction immediately afterward. (Tr. 302-03) Mr. Wescott stated that he believed that at the present time she was "right back where she was" after the accident. (Tr. 304)

The ALJ redirected questions to Mr. Wescott concerning the medical note that his wife's symptoms were under control when she took Tranxene, but Wescott recalled that it was at the time she worked at Marsh and did not remember the drug controlling her symptoms. (Tr. 206) When the ALJ asked why Wescott did not try other medications during the relevant period of time, Wescott stated that "maybe I'm just so used to being this way[,]" and dismissed the notion because she did not go anywhere anymore. (Tr. 307)

The medical expert, neurologist Charles Bonsett, M.D., testified that Wescott's only impairment established by the record was her myoclonic jerks as diagnosed by the Mayo Clinic

and Drs. Lee and Hill. (Tr. 309) However, he stated that there was no listing for this condition. (Tr. 310) The ME discussed fibromyalgia, which was an agency recognized listing, but the ME clarified that evidence of fibromyalgia came from hearing testimony only, and not from the medical evidence - reiterating that no fibromyalgia or clinical findings that suggest fibromyalgia were present in the record from 1998 to 2001. (Tr. 312) "None of the treating sources diagnosed it nor conducted clinical examinations that reveal findings consistent with fibromyalgia." (Tr. 312) The ME further stated that a lone pre-DLI reference to a "history of fibromyalgia" existed on a September 1998 medical evaluation and that the only other mention of a history of fibromyalgia was Dr. Chandrasekhar in July 2005, four years post-DLI. (Tr. 312) The ME noted that although Wescott's test results all were normal, there were other conditions that could be present and that he would seek yet another opinion on her particular problem. (Tr. 315) The ALJ finished her questioning of the ME by having him give his opinion as to her restrictions or maximum capacity based on the evidence from the relevant time period, which he did on paper, Exhibit 2F - now R.209-12. (Tr. 316-17) That exhibit, titled Medical Assessment of Ability to do Work-Related Activities (Physical) provided most of the information used by the ALJ in her subsequent hypothetical to the VE, although the ME wrote on the form that the medical findings that

supported his assessment were "the claimant's behavior during hearing."[2] (Tr. 212)

The vocational expert, Ray Burger, testified as to Wescott's past relevant work and was given a hypothetical question concerning the availability of jobs based on Wescott's age, education, and past work experience. He was asked to assume that Wescott had the capability of lifting, carrying, pushing and pulling 10 pounds occasionally and under 10 pounds frequently; ability to sit for two hours at a time for a total of eight hours a day, stand for one hour at a time for a total of two hours a day, and walk for one hour at a time for a total of two hours a day; climb stairs and ramps occasionally, but never climb ladders, scaffolds, or ropes; occasionally balance and stoop, but never crouch, kneel or crawl; no manipulative restrictions and no unusual work stresses; no unprotected heights; and no dangerous or moving equipment, with minimal vibrations. (Tr. 321) The VE stated that such a claimant would not be able to perform past relevant work, but that there were unskilled, sedentary cashier positions in the economy which she could perform, as well as unskilled sedentary general office clerk positions and unskilled sedentary hand packagers. (Tr. 321-22) Upon the ALJ's question concerning the specific limitations written on Exhibit 2F by the ME, the VE stated that the claimant could not perform these

---

[2]Circling the number of hours that the ME surmised Wescott could sit, stand and walk, respectively, in an eight hour workday, 5, 1, and 1 were circled, making a total of 7 hours, rather than 8. This is where the VE later came up with the limit of 7 hours imposed by the ME.

previously identified jobs due to the ME's limitation that she could work only a seven hour day and only occasionally reach. (Tr. 323)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled and applied that process based upon the expiration of Wescott's insured status on June 30, 2001. (Tr. 16) In step one, the ALJ found that Wescott did not engage in substantial gainful activity from her alleged onset date of August 1, 1998 through Wescott's DLI of June 30, 2001. (Tr. 16) At step two, the ALJ found that at the DLI, Wescott had the severe impairment of post-traumatic myoclonic jerks. (Tr. 16) The ALJ considered evidence after June 30, 2001, that could reasonably relate back to the DLI. At step three, the ALJ found that Wescott's impairment did not meet or medically equal one of the listed impairments. (Tr. 16-17) This finding was consistent with the ME's opinion that no listing closely resembled Wescott's impairment. (Tr. 17) The ALJ discussed the ME's suggestion to order additional testing at that present time, but she rejected this option because over six years had passed since DLI. (Tr. 17) The ALJ explained that she was "guided by the preponderance of the evidence reflecting her condition during that period [from August 1998 to June 30, 2001]." (Tr. 17)

In determining Wescott's RFC at the time of the DLI, the ALJ thoroughly discussed all of Wescott's symptoms which could be "reasonably consistent with the objective medical evidence" and

followed a two-step process, first determining whether there could be a medically acceptable basis for her complaints, and secondly evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited her work ability.  (Tr. 18)  The ALJ also considered alternative kinds of evidence in determining the claimant's RFC.  (Tr. 18) The ALJ found that at the DLI Wescott had the RFC to

> lift, carry, push, and pull 10 pounds occa-
> sionally and less than 10 pounds frequently;
> sit for 2 hours at a time and a total of 8
> hours per 8 hour work-day; stand for 1 hour
> at a time and a total of 2 hours per day; and
> walk for 1 hours [sic] at a time and a total
> of 2 hours per work day.  She could never
> climb ladders, ropes, or scaffolds; crouch;
> kneel; or crawl.  She occasionally could
> climb ramps and stairs, balance, and stoop.
> She could not perform overhead work, but she
> had no fine or gross limitations with either
> upper extremity.  She could not work at un-
> protected heights or around moving or danger-
> ous machinery.  She needed to avoid more than
> minimal exposure to vibrations.  She was able
> to perform work that did not require unusual
> work stresses.
>
> (Tr. 17)

In reaching this RFC determination, the ALJ discussed Wescott's evaluation at the Mayo Clinic including the findings that stress and anxiety were key factors, and the apparent control of her seizures with medication.  (Tr. 19)  The ALJ noted Wescott's phone messages to Dr. Hill's office in July and August of 1998 reporting seizures, and although she left three messages about the myoclonic jerking in 1999, she did not visit the physician again until April 2000.  (Tr. 19)  Dr. Hill found that her

"questionable radiculopathy" and lower extremity weakness was treatable and that she did not return for another office visit until August 2001, after her DLI. (Tr. 19)  The ALJ discussed the results of Wescott's EEGs, EMG, lower extremity EMG, and MRIs from both 2000 and 2005, as well as the evaluation of Dr. Mark Heal in June 2000. (Tr. 19)

Discussing alternative evidence, the ALJ noted the precipitating and aggravating factors of Wescott's symptoms, as well as the medications and remedies that Wescott had taken to relieve her symptoms. (Tr. 19-20)  Wescott's testimony also was considered, most notably the emphasis on her current condition and present activities, which were not relevant. (Tr. 20)  The ALJ found that Wescott's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible through the DLI in June 2001, but the ALJ took those complaints into account to the extent they were supported by objective medical evidence in assessing the RFC. (Tr. 20)  Wescott's muscle pain and myoclonic jerking also were taken into consideration. (Tr. 20)

The ALJ stated that the ME's opinion, which was based upon his assessment of the claimant at the hearing, was taken into consideration in assessing the RFC, but that nothing in the record supported his opinion that the claimant could not reach, handle, or feel, nor did the ME support his statement that Wescott could work only seven hours rather than eight. (Tr. 21)  The aspects of the ME's opinion that were "inconsistent with the

objective evidence relvant to the period, or the opinion of the treating specialists who evaluated her at the time" were rejected by the ALJ.  (Tr. 21)  Likewise, the ALJ gave no weight to the unsigned opinion from the chiropractic clinic dated four years after the DLI because it was impossible to evaluate without knowing who wrote it and also was not supported by the objective evidence of record.  (Tr. 21)

With the RFC determined, at step four the ALJ found that Wescott at her DLI could not perform her past relevant work. (Tr. 21)  At step five, however, the ALJ found that considering Wescott's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy that she could have performed through June 30, 2001.  (Tr. 22)

### Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NRLB*,

305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  **Rice v. Barnhart**, 384 F.3d 363, 368-69 (7th Cir. 2004); **Scott v. Barnhart**, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  **Lopez**, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled and the evaluation process is over.  If she is not, the ALJ next addresses whether the claimant has a severe impairment or combi-

nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Wescott argues that the ALJ's decision was not supported by substantial evidence, alleging that the ALJ ignored evidence, misstated evidence, disregarded the testimony of the ME and VE, and misstated the law when she did not find Wescott disabled simply because her condition did not meet a listed impairment. Wescott's arguments are supported only by the regulations involving the five-step process with no mention of relevant case law,

and she has made no attempt to reply to the government's response
brief, which included such support.

First, Wescott claims that the ALJ's statement, that consis-
tent with the DDS physicians, Wescott's impairment did not meet
or medically equal any listed impairment on or before June 30,
2001, is not supported in the record. Wescott in her brief cites
the DDS statements in the record, noting that a DDS document
titled Psychiatric Review Technique signed and dated November 7,
2005, has two boxes checked under "Medical Disposition(s)": (7)
Coexisting Nonmental Impairment(s) that Requires Referral to
Another Medical Specialty; and (8) Insufficient Evidence.
Wescott also notes that the box "(1) No Medically Determinable
Impairment" is left unchecked. These facts are followed with,
"No where [sic] in the record do the Disability Determination
Service Physicians [sic] limit or list the plaintiff's physical
capacities." Wescott's argument is difficult to follow, espe-
cially since this last quoted statement supports the notion that
the record is devoid of evidence which limits Wescott's capabili-
ties. The ALJ clearly agreed that four years after the fact,
there was not sufficient evidence to determine any medical
impairment as the DDS physician expressed by checking box 8, and
the ALJ plainly addressed, as did the ME, the need for referral
to another specialist as conveyed by box 7. However, years after
the DLI had passed, these observations did nothing to prove that
Wescott was disabled in 2001. To the contrary, such observations
by both the DDS physician and the ME, attempting to evaluate

Wescott's medical condition long after the DLI, illuminate the fact that the record was devoid of sufficient evidence to make a finding of disability.

Wescott alleges that the ALJ wrongfully dismissed medical evidence of "the same condition" as irrelevant to the period from 1998 to the DLI in 2001. However, Wescott's contention that "the record is replete" with evidence of a disabling impairment cites the chart entry of Dr. Gingrich from 1997 when he recommended she visit the Mayo Clinic, and the phone messages from Wescott stating her complaints in her own words. Wescott's phone messages were not objective medical evidence, and the entry by Dr. Gingrich, although discussing the myoclonic seizure disorder, was discussed in the ALJ's decision, as were later entries which discussed Wescott's improvement. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)(affirming ALJ's denial of disability in light of claimant's litany of ailments which were unsupported by medical records).

Wescott contends that the ALJ mistakenly took the position that if a medical condition did not meet a listed impairment, it was not disabling, and that she failed to consider her combination of impairments which could have been expected to last for a continuous period of not less than 12 months. In order to recover benefits, Wescott "must establish that she was disabled as of [her DLI]." *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Wescott points out that the "Act and regulations further require that an impairment be established by medical

16

evidence that consists of signs, symptoms, and laboratory find-
ings, and not only by an individual's statement of symptoms."

Dr. Gingrich, as Wescott's treating physician, noted that
Wescott was able to return to work and that her symptoms were
under good control, and this opinion was entitled to controlling
weight. 20 C.F.R. §404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d
500, 503 (7th Cir. 2004). Although Wescott has made statements
describing her symptoms both in phone messages and in testimony,
the ALJ carefully discussed the objective medical evidence. The
ALJ considered the laboratory findings and test results from the
relevant period time, as well as the physician's notes, and
determined that there was insufficient evidence that Wescott's
subjective symptoms in combination showed a year-long period of
disability, regardless of whether the combination of conditions
met a listing. *See Stuckey v. Sullivan*, 881 F.2d 506, 508 (7th
Cir. 1989)(affirming ALJ's finding that combined impairments did
not make claimant disabled and substantial evidence in record
supported such a conclusion); *Martin v. Barnhart*, 501 F.Supp.2d
1179, 1185 (N.D. Ind. 2007)("Plaintiff bears the burden of show-
ing through testimony and medical evidence supported by clinical
data and laboratory diagnosis that she was disabled during the
period in which she was insured."). *See also Eichstadt*, 534 F.3d
at 668 (affirming ALJ's finding in denying benefits for fibro-
myalgia where claimant's allegations regarding her limitations
were not totally credible and where finding was grounded in lack

of evidence available regarding claimant's condition prior to her DLI).

Wescott points out that the ALJ made an incorrect statement that the only mention of a history of fibromyalgia was in 2005. However, this was a statement made during the hearing while the ALJ was questioning the ME – not a finding in the ALJ's decision. This misstatement immediately was corrected by the ME, who pointed out that a history of fibromyalgia was noted on a 1998 record. Thus, the contention based upon this misstatement by the ALJ during the hearing is irrelevant. Wescott includes in this argument the alleged misapplication of the testimony of the ME and VE. Wescott bases this on Exhibit 2F completed by the ME, where the ME stated that the sum of hours Wescott could sit, stand, and walk in an eight-hour workday was only seven, and the VE's statement that based on a limitation of working only seven hours at a time, Wescott would be unemployable. But the ALJ plainly discussed the fact that the ME based this assessment on Wescott's behavior during her hearing testimony. The ALJ made clear in her decision that regardless of any assessment in 2007, the record lacked evidence of such a limitation in 2001 at the DLI. *See Eichstadt*, 534 F.3d at 667 ("[I]t is evident from the ALJ's decision that she did not 'fail to consider' this evidence [post-dating the DLI], but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period.").

Simply put, Wescott carried the burden to prove she was disabled during the time period between her alleged onset date and her DLI. Wescott's brief recites a list of reports of seizures, difficulties standing and walking, pain, inability to drive, collapses, and "atypical spells." However, none of these reports were substantiated by objective medical testing included in the record. The ALJ's written decision thoroughly and clearly discussed the inconsistency between Wescott's complaints and the objective evidence and still took her complaints of symptoms into account when assessing Wescott's RFC at her DLI.

_____

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**

ENTERED this 5th day of November, 2009

s/ ANDREW P. RODOVICH
United States Magistrate Judge